Case No. 23-5026, A.P. Bell Fish Company, Inc. et al. Appellants v. Gina Raimondo in her official capacity as Secretary of the United States Department of Commerce et al. Mr. Hobbs for the appellants, Ms. Mishra for the acqualeads. May it please the Court, I am Tim Hobbs, counsel for the appellants, A.P. Bell Fish Company, Southern Offshore Fishing Association, and the Gulf of Mexico Reef Fish Shareholders Alliance. We represent the commercial fishing sector, and we are joined by Amiki, representing a charter boat operators, commercial fish distributors and processors, seafood processors, and restaurants, all of whom are concerned with the action being challenged in this case because it reduces the supply of seafood for consumers and undermines conservation of the red grouper stock of fish in the Gulf of Mexico. It reduces quantity for commercial, right? I thought the whole effort of the rule was to stem or continue to stem the decrease in stock. What the service did here, Your Honor, was reduce the overall catch limit that applies to both the commercial and recreational sectors. For the purpose that was clearly stated. For the purpose, in part, to cover the increase of dead discards in the recreational sector. Right. And the whole emergency that the 2019 Act would address. Right? That's part of it, Your Honor. But then what happened in this case under Amendment 53 was that there was a further reduction in the overall catch limit to correspond with the change in allocation between the sectors and the need to account for increased bycatch and dead discards in the recreational sector. Right. Is that right? So, well, in the sense that that is the position your client is arguing. I think that the, if you look at the, there's a chart, Table 1 in Amendment 53. This is in the Record Joint Appendix 3314. There's a chart there where it shows the change in the catch limits that would apply under each of the allocation scenarios that were being considered. So, as the allocation shifts more to the recreational sector, the total catch limit comes down. So, you argue that the district court was wrong in when it says the continuation of the shift to the SEC reporting system did not change or enhance the recreational allocation beyond what it would have been under the old system. I think what happened here is that, you know, so there was a new survey that showed that the recreational sector was catching more fish than previously estimated. And so, what the service did was to increase the allocation for the recreational sector to match the new survey results. That essentially, you know, prolonged the recreational fishing season around to where it would have been, you know, but for this change in the- So, my question was, is it your position that the district court erred both as a matter of law and fact in its discussion of what the agency was doing when it was continuing to switch over to the SEC? My sense is that the district court accurately described the background and how we got here. I think the problem here is that there was this new survey that showed higher catch in the past, and so the allocation was reset to match that survey. But what the survey also showed was that bycatch and dead discards in the recreational sector were far higher than previously estimated. And so, a change was made to give the recreational sector the benefit of its increased landings in the past, but then nothing was done to account for this increase in dead discards that the new survey results also showed. Let me just back up and ask you just to probe why it's seen as a new allocation at all. Because one way of looking at Amendment 53 is that it restates in the new FEF units the same historical allocation that Amendment 30B had expressed in CHTS units. In other words, both are allocating red grouper based on historical landings in the same period, 1986 to 2005. And the innovations are, one, the FEF, which is not challenged here, and which it's not that there's a greater allocation now under Amendment 53. It's that the service recognized that in the name of the one million pounds or whatever on your chart, the top right cell showing one, that actually in practice all that time it was much more and should have been, now that we have the FEF units, 2.1. So it's not that they changed the allocation, but they acknowledged the existing reality of the numbers that had been locked on the whole time. And because they're using the telephone survey both to set the numbers and to follow up, just the whole thing was undercounted. So that's one change. The other change is that there's a new lower fishing limit, which I took to be based on the stock survey. When you realize more are being fished, you had to bring it down. That it wasn't because there was this greater allocation. It was just, we have to be careful about not only current fisher people, but future fisher people, your clients. So I guess the basic question was, why is there a new allocation at all? Well, so you are correct, Your Honor, that what the service did here was essentially take the new updated numbers, plug them into the old allocation formula, and then that spit out the allocations that resulted from Amendment 53. That portion is correct. So in a sense, it is updating the allocation to reflect the latest information. But the problem is that the new information also showed something new that was not previously understood. And that is that the bycatch and dead discards within the recreational sector is significantly higher than previously estimated. And so our concern is that nothing was done to address that piece of the issue. So there were two new things that we learned. The service updated the allocation to deal with the increased landings, but then nothing was done to offset the increase in dead discards that also were learned about as a result of the new service. Are you saying an increase in dead discards apart from the fact that when you recognize the recreational sector is more active than you thought, and it has a higher rate of dead discards, that along with that comes the realization that the fishing activity overall is yielding a higher number of dead discards? That's what I thought the case was, not that there was some separate study about the rate of dead discards. That's correct, Ryan. It's not a separate study. It was the same survey that showed both higher landings or the amount of fish brought to rates of dead discards in the fishery, so fish that are thrown away dead and not retained and not brought to shore, essentially wasted. And so what... Weren't there three things, the two things you've mentioned, but also real concerns about death from these algae blooms? That's right, Your Honor. And so what happened here is the agency had either two or three, depending on how you There's a lot more recreational fishing going on. There's a lot more discards by catch, and a higher percentage of that is mortal by catch. And we got a problem because these fish had already been harmed by multiple algae blooms. So they had a whole bunch of new data, new information, updated information before them. They said, all right, we got to come up with a new plan. So there are three things, not just the two, correct? That's correct, Your Honor. And I think that's actually shown in the chart that I just called Your Honor's attention to. If you look in that chart, there's a column for the ACL. There's the number 5.35. That's what the catch limit would have been previously before Amendment 53 took effect. Then if you go down to Alternative 2, which is... I thought Alternative 1 was the status quo ante. Alternative 2, retain current percentage. So that's just translating to FES. Correct, Your Honor. So then if you go look at Alternative 2, the catch limit is reduced from 5.35 to 4.90. My understanding is that that reduction is attributable to the guidance that came from the stock assessment and taking into account things like red tide and the need to be conservative in managing the fishery. But then if you go down to the next alternative, Alternative 3, which was selected in this case, it shifts the allocation and the catch limit decreases from 4.9 to 4.26. So that is a reduction of 640,000 pounds. It is attributable to making up for the shift of allocation to the recreational sector and the harm that will be caused to the stock as a result of that shift. So the service recognized that the overall catch limit would have to come down for both sectors in order to make up for the increase in mortality from shifting more fish to the recreational sector. You keep saying shifting more fish to the recreational sector. And I'm not sure I follow that because it's a recognition of activity that was going on at this much higher rate all along.  And so really this interesting comparison is if you look at, on the top line, Alternative 1, commercial ACL 3.16, and then recreational ACL, the second column expressed in FES units, 2.1. And all that Alternative 3 does is effectively say, okay, now that we know the reality, what has been going on all along and what has been approved under an unchallenged Alternative 1 scenario, it's not a challenge in this case, is actually different. It's actually better expressed as 3.16 versus 2.1. And now that we know that, we know fishing activity overall and the stock that we've studied, we're in trouble, we're on a collision course. So we're going to take both of those numbers down about 20%. So we see 3.16 versus 2.1, it's about a 60-40. And then on line 3, on fertile Alternative 3, 2.53 to 1.73, it's about 60-40. So this narrative about, I understand people perceived it that way, but this narrative about a shift of allocation to the recreational sector appears to me to be entirely illusory. Well, I think it's correct, Your Honor, that if one is looking strictly at the number of landings of fish brought to shore, then you are correct that the effort there was to match new allocation going forward with what in reality had been caught in the past. That is correct, Your Honor. But the new fact that was not addressed was also the increase in dead discards. And so the service attempted to address that issue, to account for that additional mortality by reducing the catch limit. So in this case, the reduction from 4.90 million pounds to 4.66 million pounds, that was necessary to cover the additional mortality on the stock that would result by shifting more fish to the recreational sector. On paper. On paper. Your Honor, what if, even though they did the FES, the study that yielded the FES figures, nothing changed in the way that it was expressed for enforcement purposes? You had 3.16 to 1. And then knowing what they knew about that 1 is really supercharged, they just kept with the old landline methods. But knowing what they knew, that they were on a collision course, they just shifted it all down 20%. In your view, what's the challenge? Let me make sure I understand your question. So we've got... I don't know if you could shift it down 20%. That would be tricky. Because once you haven't expressed it in the parallel way... And that's the issue, is that if you look at the 2.1 figure compared to the commercial figure, we're already at a 60-40 allocation. Right. That's my point, is that we were all along at 60-40 allocation. We were all along. Correct, Your Honor. Yes, that's true, looking specifically at the landing zone. That's a separate point. The point about the landings and, you know, the service says, well, in the way we understood landings, built into that is a proportion of the eye catch. And so we are accounting for that. And the way we're accounting for that is by actually keeping the allocation the way it was and recognizing that that way of operating is going to rock the boat the least, but everybody has to belt tighten in light of that. Understood, Your Honor. And I think that would hold, but for the new information that was learned about how many fish the recreational sector has actually discarded. Was that new information? I thought they... It's just like more fishing is happening in the recreational sector. Right. And we've always known that the recreational sector is much less efficient when it comes to dead discards. And because there's more of it, we have more dead discards. And so your view is that there needs to be a permit system for the recreational side or there needs to be... We're not here to take a position on what the proper solutions are for the recreational sector. But we do think that there are many tools that the agency has at its disposal to get at this issue about dead discards. Give me your favorite example. I mean, Louisiana says, like, this is what recreational fishing is. Sure. But I think we reject the premise that recreational fishing is immutably dirty and unaccountable. That's why I'm asking you, what do you see that is consistent with what recreational fishing is, which is the statute? Sure. So there are multiple examples, Your Honor. There are gear modifications. And in fact, the Coastal Conservation Association's brief talks about recent legislation passed by Congress called the Descend Act that requires devices to be carried onboard vessels to reduce mortality of fish that are released. What to be carried? They're devices that essentially puncture the air bladder of a fish that has been brought up from very deep depths. Because gases expand as the fish is brought up. Oftentimes, the fish then floats on the surface and dies or is eaten by something else. So by puncturing the air bladder, they can be dropped back down to the ocean floor and released. Sent to beds. Exactly. Right. And they survive after their air bladder is punctured? Some still do die. It's not 100% effective, but it does reduce the mortality. So that's one example. What if they just die from not having a punctured air bladder? That's also possible, Your Honor. Wait, wait. You said this was your example of what would reduce mortal bycatch. And if it just changes how or where they die, that's not reducing bycatch. I think studies show that it does actually mitigate the bycatch. So instead, you know, it reduces it to some level. It doesn't eliminate the mortality altogether. Some still do die after being reeled up to the surface, having their air bladder popped, sent back down. I mean, there's obviously trauma to the fish, both from the hook and from the puncture. So some mortality does happen, but it's perceived to be less than the mortality that would happen without using this device. Congress found that it is. It's before Congress. Did they pass the law or it's pending? It's been passed. And the law requires vessels to carry the devices. It doesn't necessarily require anybody to use them. But they have to be on board. So does that apply to any appointed? I just want to clarify. I don't understand this. This applies to commercial? And recreational. So every individual who wants to go fishing now has to have this little bariatric chamber for the fish? Well, yes. It's not a bariatric chamber, but it's a crew device meant to address the same effects. Yes. So every individual fisher person will have to have this under this new statute? Each vessel is required to carry one. There's no requirement to use this. Is a vessel every boat? So anybody fishing off a pier doesn't have to use this? Correct, you're right. But anyone who goes out on a boat, even if they're on a rowboat, has to have one of these? I think if you are actively engaged in the reef fish fishery, that's that issue in this case. Then you do. I don't think it applies to any... Actively engaged, does that mean you fish more than once? Or if someone just goes out... I'm trying to understand this. I didn't... My understanding is that if you are engaged in fishing for red grouper or other fish, then you fall within the ambit of the statute and have to have the device. And your point is, so what the... Congress already passed this law that the fisheries service couldn't require people to use it? That's right. There's no use required. That's all that's being carried. So you're saying the agency could require use? It could require the use. In fact, they actually used to also, under regulation, used to require vessels to carry the same device. But you said it's already passed the law. That's sort of pointless at this point. The agency, yeah, could require them to be used. There could also be time and area closures, as in one of the cases we cited, the National Coalition case. That was something that the agency looked at for a different type of commercial fishing. But you can close areas of bycatch hotspots, for example. So the agency could say... How do you respond to the agency's position and the state's position that the agency was looking at these nine alternatives, explaining why it acted as it did? And that's all that was before it at this time. And yes, there are other things it could do, even beyond what you suggested. But there was no obligation that it do so at this time when what was before us, before it, was the nine alternatives. Yes, Your Honor. So that, I think, brings us to our national standard for argument. And so what the statute requires is that for any allocation, it must promote conservation. And to Your Honor's point, while this may have been a change to reset on paper what was happening in reality, there's no debate that this was an actual formal amendment to change the allocation within the fishery management plan itself. But it was in the context of considering, as I understand it, the agency's alternatives that it thought would carry out its purposes at the time. Not that it couldn't do things in the future, but at least as to at the time, it really wasn't going to make much of a change, which was the thrust of Judge Pillard's line of questioning. That's correct. So why was it obligated to do everything that was possible on the table to address this dead discard increase? So we are not arguing that the agency was required to do everything on the table. No, what it wanted to do is something about dead discards. And the agency, as Judge Pillard's line of questioning in your answers made clear, it seems to me, that it stated the 60-40 allocation. Now, it knew more, but what it was focusing on was the threat to the stock. And there were other problems with these other alternatives. So for now, it addressed what was before it. That's all I'm getting at. Not that there aren't things that can be done. Yes, Your Honor, but by formally shifting the allocation on paper, the agency entrenched this issue with dead discards. Oh, for the moment, when the question was, as a result of the updating and as a result of the continuation of this transition of counting, and so that's all the agency was dealing with at the time. That's what I want to understand. Why was it required to do more? I mean, we have all these cases, you know, the agency can address these problems over time, periodically. It doesn't have to do everything at once. Congress has already passed the statute, so it's out there. Yes, Your Honor. We would point to National Standard 4 of the Fishery Act, which says that an allocation must promote conservation. Right, and I didn't think you weren't arguing that, but rather that you were arguing because of better knowledge, the agency now knows about this increase in dead discards because it knows that there's more recreational fishing going on. Right, and as a result of formally changing the allocation for landings to match what had been happening in the past, that locked in a higher level of dead discards going forward. No, you say formally locked in. I mean, for purposes of this rulemaking, yes, but it wasn't as though the agency said it was never going to do anything in the future. Your argument is they have to comply with the national standards in this. That's correct, Your Honor. Your argument is more than that. It's that it cannot address it the way in which it did, namely by maintaining an allocation. I think what we're saying here, Your Honor, is that by formally shifting this allocation, even with reducing the catch limit, the stock was still left worse off. As a result, based on all the information we know now, as a result of Amendment 53, the stock is going to be smaller. It's going to be less productive. It's going to give off smaller yields in the future. Well, yes, but the agency is looking long range. Is this the way toward better health? You're saying, as I understand it, well, even if it is, there are other things that could help even more. That's right, Your Honor, and I think that's why National Standard 4 – sorry, go ahead, Your Honor. You can finish your answer. That's why National Standard 4 talks about promoting conservation. That's why National Standard 9 talks about minimizing bycatch. We think that these things must be addressed each time the agency takes a regulatory action, especially one that makes the stock worse off as a result of the decision it made. That the stock is worse off, recognizes. So is it your position that once they did the fishing efforts survey, that actually Amendment 30B's allocation itself became impermissible in violation of National Standard 4? No, Your Honor, because that allocation was undertaken at the time using the best available information that was there at the time. So that was almost – But if they just said, okay, we're going to stick with the status quo, there's too much complexity between the sectors, so we're going to keep Amendment 30B's allocation going forward, that would not be a problem in terms of conservation? Well, I think if you know, the conservation impacts would be much better, actually, if the existing allocation had been maintained. That's alternative two in the chart that we were talking about earlier. Maintaining the prior allocation at 76-24 would have resulted in a higher catch limit for both sectors, and it would have resulted in less overall dead discard for fisheries. Unlawful, right? Because in light of the status of stock, couldn't have happened. Alternative one would have been unlawful. Alternative two was lawful. That was simply updating – Bring it down, bring it down. Yeah. It seems, though, like under your reading – I guess I'm not sure what the stopping point is. Under your reading of National Standard 4, any allocation to the recreational sector fails to promote conservation. We don't think that that's the case, Your Honor, because we think that the issues in the recreational sector that lead to high bycatch can be addressed. We don't think that these are immutable characteristics of recreational sector. So, any allocation to the recreational sector without additional bycatch measures, anti-bycatch measures, would be a violation of National Standard 4, in your view? That is correct, Your Honor, because if you look at the statute, the plain language applies specifically to allocations, and allocations must promote conservation. So, until the bycatch rates for the recreational sector are improved, the service under your reading has an obligation to zero out recreational fishing. And then, as it tests and understands that there are ways that the best scientific evidence supports to minimize bycatch, then they can reintroduce recreational fishing. We don't think there's a need to zero out recreational fishing. I thought that was the logic of your position. No, because what we're saying is, under the status quo prior to Amendment 53, there was an allocation. It was implemented based upon the best available information in 2005. That has not been challenged. Those regulations are on the books. But now we have the FES, and so we know that that is no longer based on the best available scientific information. Right, but there's nothing... The best available scientific information is that it's more like a 60-40, actually. But there's nothing to compel the agency, to make the agency actually change the allocation. It no longer comports with the best available scientific information. Absolutely. Yeah. But that's typically the case in these fishery management regulations. An action is taken, years go by, new information is learned. That could be cause to grounds, rational basis for amending the regulations. But it's not like the service is constantly under obligation to update all of its regulations every time it gets one new piece of information. This is an iterative process that's taken over time. National Standard 4 says explicitly that if it becomes necessary to make an allocation, then these requirements apply. National Standard 4 does not compel the agency to change an allocation. Well, it is necessary in light of... I'm sorry, I'm just misunderstanding. It is necessary in light of FES, so then they couldn't just recapitulate Alternative 1 by embracing Alternative 2, because it doesn't fit with the historical record that they've been relying on all this time. That would have been a choice based upon a different rationale. I think if the agency had selected Alternative 2, they would have justified it by saying, you know, we think that the prior allocation should continue going forward, even despite the new information. Maybe because to address the bycatch issue, right? There were other reasons that could have motivated the agency to support Alternative 2, even though new information showed that what was done in 2005 was no longer active. And undermines the very methodological premise of that, so they would just have to say status quo ante. That's our new rationale. Right, but Amendment 30B used an allocation formula, right? Looking at the years 1986 through 2005, right? That formula could have been changed. There's something that holds the agency to using the same formula. But then they wouldn't have come up with Alternative 1. They wouldn't have come up with sticking with the same. They would have come up with something different. So I think Alternative 2, sorry, let me make one point. I think the point of Alternative 2 was merely to not do an allocation change and merely to update the management system and the catch limits to be consistent with the new FES units. So in other words, Amendment 53 didn't have to do these two things together that it did. There could have been different amendments to accomplish these two objectives. So one amendment could have been just the allocation change, and another amendment could have been modifying the catch limits according. Excuse me. Go ahead. No, no, you go ahead. The agency brief citing to the record points out why Alternative 2 doesn't work, all right? But it also makes another interesting point, and I didn't see a response, and that is even if you get back before the agency, the three alternatives differ, what does it say, by less than 1%, and that is not going to provide you with the remedy that you're seeking. And I didn't see a response in your reply brief other than to say, well, you never know what an agency is going to do on remand. Is that correct? I'm sorry. I'm not following your question, Judge Rogers. Oh, I'm so tired of hearing that. I'm just reading the brief that was filed in this case, all right? Excuse me, Your Honor. Would you mind pointing me to the page that you're looking in the agency's brief? Okay. So if you see on page 47 where the agency talks about these alternatives, do you see that? Yes, Your Honor. And what you told us this morning is not consistent with that, even though that's what the record says. And then it says, Forcing, on page 48, four lines from the bottom, the fisheries service to, I'm quoting, reconsider alternatives three to five would not redress Plata's alleged injury, loss of catch share because the sector landing allocations in those three alternatives, quote, vary by approximately 1%. Yes, Your Honor. And you don't say in your reply brief that's incorrect.  We were not requesting to force the agency to reconsider those alternatives. You want more of a share in light of this discharge. I mean, that's what this is about. This is not, say, the Planet litigation. This is the commercial sector saying it wants a larger share, that its share has been reduced. And contrary to National Standard 4 and contrary to some other things that you argued. It is true that the commercial sector share has been reduced. But the other problem – But what I'm getting at is even if you win this case, says the agency, you get back before the agency and the alternatives you're looking at are not going to provide you the relief that you're seeking, namely a greater share. The relief that we're seeking here, Your Honor, is for the agency to do something about dead discards in the recreational sector. Even if it reduces the commercial sector further, that's fine with you on remand? That's not what this case is about, counsel, and you know that. Of course, my clients challenged the allocation change because they lost quota. But that was not the only reason, Your Honor. There are ongoing management problems within the recreational sector that are  I'm acknowledging the agency's alternative argument, and I'm also acknowledging the agency's alternative argument. And where did you respond to that alternative argument? So the reason we, I guess, did not address this is because that is not the relief that we're seeking. Our clients were clear from the get-go in this process. We were not out to necessarily maintain the prior allocation. What we wanted was an allocation review. So the Gulf Council, who developed these regulations, Amendment 53, has an allocation policy. And that policy says when we receive updated information about landings, like we did under the new FES survey, we should undertake an allocation review. Counsel, the bottom line here I'm trying to get you to focus on is, normally we don't send things back to the agency for a useless act. You don't tell me in reply, this is not a useless act. You're just saying you want the agency to do something about these discards, and it didn't. That is correct, Your Honor. That is part of the relief that we're seeking here, is that the agency acknowledge the discard issue, and actually do something about it. Because it's causing problems in the overall fishery. And it's a violation, basically, of National Standard 4 not to do something about it immediately. And National Standard 9, Your Honor, which specifically minimizes bycatch to the extent practical. To the extent practicable. And the agency has told you why, in its view, this is the practicable way to go. You may disagree with that, I understand, but I'm just wondering where the court is left. So the agency undertook a 22-page bycatch practicability analysis, but it never grappled with the issue here, which is that as more of the allocation is shifted towards the recreational sector, there is more dead discards that need to be dealt with. So the agency said we have nine alternatives in front of us. Here's our evaluation of them. And for the reasons the agency said, it's fair to both groups to adopt alternative three, which leaves the allocation basically where it is. Right, but there are two problems with that, Your Honor. One is that it penalized the commercial sector for dead discards that are happening in the recreational sector. But more importantly, the agency explained why the alternatives weren't any better, in its view. Right, but more importantly, Your Honor, the action that it took, the reduction in the catch limit, did nothing to solve the problem with dead discards. But the agency thought it was addressing, in one sense, a larger problem, namely, avoiding the extinction of the species. And they thought this was the way to do it. And that's not to say that what your clients are suggesting may not be good ideas. But did either the standard four or nine require the agency to adopt what you're doing? Or was it sufficient for the agency to explain its rationale and rely on its expertise? So national standard nine contemplates that bycatch shall be minimized to the extent practicable. To the extent practicable, counsel. I mean, that's a word ripe with deferring to agency expertise. Yes, Your Honor, and we acknowledge that. But what the agency did not do was think about and look at ways that bycatch could actually be minimized and then make a determination about why those things are practicable or not. That's what we're saying the agency should have done here. The agency should have said. What I'm always trying to get you to focus on, counsel, and you don't disagree with this as I can read your brief. It had nine alternatives in front of us, in front of it. It dealt with all nine and explained why it chose one as opposed to the others. That's what I'm getting. It's not that these things can't come up in the future. It's not that you can't file a petition in the future. But in this rulemaking, here's what was before the agency. We agree that there were multiple alternatives that were considered, Your Honor.  And it's going to end up having negative consequences for the overall stock in the future. Well, that's what I asked you about the agency's alternative response. And you don't, as you say, you chose not to address it. Our response is that there should be a remand for the agency to comply with National Standard 4 and with National Standard 9. Just to clarify, under remand, Are you asking the agency to reanalyze these six options, or are you saying there's a flaw in all these options because all they did to address bycatch was lower the overall catch limit? So all of these options are, in your view, legally flawed because they weren't addressing bycatch as required by Standard 9, or I guess you would say conservation is required by Standard 4. So the agency is going to have to go back, not and reanalyze these options, which only change by one percent, but actually do the hard work in your view of figuring it out, how to, with this new statistical information, reduce bycatch and promote conservation. Precisely, Your Honor. That's exactly what we are saying. I just had one question about your argument that Amendment 53's economic analysis is materially inconsistent with the analysis in Amendment 28. If we were to so conclude, what's the remedy? If that were the only defect we were to find, what would be the remedy? To vacate and remand to the agency for further action. Why would we vacate given that if it's a failure of explanation and acknowledgement, we sometimes under Allied Signal don't vacate? Understood, but that analysis was critical to the justification for Amendment 53. In multiple places in the record, the agency justifies that all the bad things that are going to happen as a result of this by saying, this is going to result in the greatest net economic benefits to the nation. That conclusion is flawed. There is no basis for the agency to make a conclusion like that. That was the lesson from Amendment 28. And so if you strip that justification away, the amendment crumbles. So on the rest of your analysis, is it correct to think that you're basically saying it's incumbent on the agency at this juncture, given what it now knows about the relative harmfulness of the recreational sector, to abandon its reliance on historical allocation as between the two sectors. It just has to do something different now that that was the way it did before. But now that we know the much bigger role of the recreational sector and its relative draw on the stock that they just need to start from scratch. Is that your position? Essentially, Your Honor. And I think that's what we were asking the Gulf Council to do in undertaking an allocation review, starting from scratch. What do we want this to look like in the future? How are we going to address the bycatch and other issues that need to be addressed so that we can have, you know, this fishery for long-term, you know, maximum utilization. I'm making sure that it's conserved for long. But in doing that, don't they, they still under the statute, don't they have to account at least for the new statistical information and shares? Indeed, Your Honor. And they can't take that off the table as part of their analysis. There's part of their decision-making. Correct, Your Honor. I mean, presumably, the allocation would be based on some data or some other decision criteria that would be used. We think they just could use the historical landings period, but then it has to take into account all this other information that we've now learned about bycatch and discards and make sure that. Either not cue to the historical allocation or cue to the historical allocation and do X, Y, or Z to address bycatch? We think that that is ultimately a choice for the Gulf Council to make as to how to proceed going forward. So you think they could continue to do the historical, apply those statistics, but if they're going to do it in the face of evidence that there's a real big bycatch problem in one sector, they've got to do something along with that to address the bycatch, which would leave you with the exact same percentage you have now. It just might mean more regulation on the recreational sector. That would be fine for your client. Yes. Our concern is with addressing the impacts of the stock and avoiding dead discards. Yes, sir. Any other questions? All right. Thank you very much. Thank you. Okay. Good morning. Please support. For the fishery service. Carefully balanced approach to do two things. First to account for updated data on the status of red grouper stock by reducing catch limits to support it. And second, both evenly distribute and quote the burdens of reduced limits by restoring historical participation of actual red grouper catch by the commercial recreational sectors. In light of more accurate data about the actual catch amount. Appellants would prefer a different balance so that they could take more fish to others detriment from this limited pool, but they identify no legal entitlement to one. The app provides for the service to perform just as it did here. The app provides for the service. Carefully accounting for scientific data and recommendations and selecting catch limits that comply with the national standards, including its direction to balance prevention of overfishing with achievement of optimum yield, a statutorily defined term that expressly contemplates recreational opportunities. The agency carefully considered each of the pounds objections in the regulatory process and well-explained how it had adequately accounted for. I'm sorry. Can you slow it down a little bit? Sure. It's hard to hear you. It has something also to do with the amplification. Okay. I apologize. Um, at the end of the day, the challenge will promote conservation, minimize the sky catch to the extent practical includes proper accountability measures and calibrated traps limits and is supported by well-raised. What does it look like? It looks like what happened here is you got new statistical information. And you said, well, we have to reallocate based on that. It's going to have to be 60, 40. All your alternatives vary from that number other than the, of course, status quo, which you couldn't do. So that was sort of a, right. That was going to be off the table before you even started. So all you did was go, we got it. We got to do 60, 40. And it's a shame. That's going to result in extraordinary. Increase in. Extraordinary to our knowledge, new information about. Um, by catch and mortal by catch. At a time when the species is already in trouble because of these technology blooms. But we are not in, in the, in the amendments words. I'm not proposing to directly reduce by catch of red grouper. In this amendment. We're not addressing it. Instead. We're just going to lower the cash limit. Is your position is that. No. Other analysis. I'm sorry. Standard nine. It's fine. If all you do to deal with what is now recognized to be a material and significant increase. In by cash. You're now there. Just didn't know about it before, but now it's in front of you. That's standard nine. So that's fine to go. We're not going to deal. The bycatch other than we'll just lower. The overall cash limit. When I do anything by catch folks. How is that consistent with standard nine? So the first point is that standard nine incorporates the, to the extent practicable language and more broadly in the structure. You didn't do. I mean, you just. The amendment says we're not. Going to deal with bycatch directly. We're just not going to deal with it directly. I don't think that's the full description of everything that was. That went on with respect to analysis of bycatch. So for example, some of the measures that are being pointed out by the plaintiffs here are measures that are already in effect, for example, and there are plenty of others that they aren't getting into. So for example, there's discussion in the, in the amendment. For example, there's that we, there would be season closures. If incoming data shows that they're going to be protected to reach or exceed. Those ACLs. If that. I'll have to close it. If they're exceeding the cash limit. That's not addressing bycatch. That's just the rules. But that happens regardless. Right. But the idea being that there are a number of different ways in which to sort of preserve and promote conservation that took account of bycatch and bycatch. All you should be reacting to after the fact. Too late. A problem. I don't think that's, I don't think that's quite what the agency did here. The agency here did what was consistent with what I understand to be the case law. So for example, there are cases, for example, in other circuits, like little day lobster is one in the first circuit. It talks about how you analyze the proposed alternatives, the things that are before you, and you look at those. With respect to making that decision. And then that decision is assessed under the act and under the executive order. So let me be clear. How, how do you choose the alternatives? That quote are before you before the agency close quote. So the agency designed the alternatives to, through six to have the same risk of overfishing basically to, to prevent overfishing at the same, to the same degree. And they designed those to have those kinds of trade-offs and to take fully into account. Things like the bycatch and the dead desk cards issue to the extent that there is one. And we know that because. We know that because. I believe that joint appendix 5819 may have this discussion. 5819. Let me double check that. Where it talks about how the, I believe it talks about how the acceptable biological catch, which is set to the, to the same as the total annual catch limit. Was accounted for by catch. And any increases from the recreational sector. And I think that's something that judgment was actually referring to. They took into account when they were setting these different alternatives. That there may be trade-offs about what may happen with respect to discards and to be clear. So let me get that council. Does the record actually say. I'm sorry. Does the record actually say. Took into account. I can't recall exactly what you said. But took into account all the new information about this car. I believe so. Yep. It talks about. Which volume are you in? There's so many. I think it's. Okay. But this is 5819. It's not in the amendment itself or is it. No, that's in the final rule. I don't know. Yeah. Sorry. Okay. Okay. And it talks about how. I didn't mean to slow you up here, but. Okay. The key argument here this morning. In fact, the agency has already done its work on this. Bypass. Increase information. It seems to me. We ought to have those. Record citations. Sure. So, so the 1st point is that to the extent that they are. Suggesting that there was some change with respect to the bypass issue. That's something that is incorrect as described. No, no, no, no, no. But questions made it clear that, you know. That's not what happened here. All right, the agency. Learned a lot of things about what had been going on. All right. So, my point is having this new information. I thought what you were responding to judge. Was and the agency dealt with all this information about. Increased bypass and mortality. So, so the agency discussed. So, for example, there's extensive discussion also in amendment 53 in the entire bypass appendix to amendment 53, which is an entire bypass appendix that talks about, for example. Which appendix is that? That's appendix B. That's appendix B. And that is. B, as in boy. B, as in boy, and that's joined appendix 3515 to 3537. And there's extensive discussion in there. You know, appellants have conceded, for example, below that the service admittedly undertakes efforts to estimate that discard. That was something that they had acknowledged. There's also the fact that most of the measures that they're pointing to largely are, first of all, kind of new in being presented in this way on appeal. But in addition, the measures are already in place. They talked about the bycatch problem. They were on their hands about the bycatch problem. Where did they consider another alternative for dealing with the bycatch problem other than lowering the cash limit with this wooden 60-40 division? So, as mentioned, the entire way that this challenge has been brought and in terms of what the plaintiffs have brought, they have not been proffering additional alternatives. About whether the agency grapples. Yes. Indications to deal expressly and specifically was added by Congress, deal with bycatch to the extent practical, which means there should be an agency decision or language somewhere that says it is impracticable for us to do anything other than divide this 60-40, because that's what the statistics say, and lower the cash limit. But it doesn't say it's impracticable to do anything else. I guess what I'm saying is that with respect to the alternatives that were presented here, the agency fully considered them and its reasoning for why it was trying to restore what was actual historic participation. No, no, no. We heard that. You want the specific sites for the bycatch consideration, for example, right? You want the specific citations for the consideration of bycatch. That's right. Let's do this in stages. So did any of those alternatives, 2 through 6, deal with the bycatch problem any differently between themselves other than the cash limit? Is there any alternative approach other than lowering the cash limit that was applied in any of those alternatives? So there was discussion also of existing measures, which are largely overlapping with the ones that the plaintiffs have been pointing out today. For example, the DEFEND Act applies to the recreational sector, and it requires them, for example, to carry certain types of equipment to try to restore this discharge to the sea if they can. And there are size limits, and there are bag limits, and there was discussion of that. There was discussion of season closures. There was discussion of future season reductions, if there would be overages in other years. And it talked about all of those as addressing the bycatch issue. With respect to what was being done here, the alternative that the commercial plaintiffs had been advocating for – No, no, no, that's not my question. I'm sorry if I'm not being clear. I guess they talked about a lot of things. Right, but they – But what – we have, let's just say, there's six alternatives that we could take status quo off the list. Do any of them – do they all deal with bycatch the same way, yes or no? I believe that they all take into account bycatch in determining what the annual catch limit will be. The only way they deal with – they all – there were no alternatives here in dealing with bycatch. Every one of these alternatives did the exact same thing. They dealt with bycatch by doing one thing and one thing only, and that was lowering the catch limit. There's never been a – Is that correct? There's never been a – Is that correct? I'm sorry, I really am trying to understand what's going on. Yeah, I understand. I think the only alternative – so they are advocating for the alternative – No, no, I don't like your argument. I'm really trying to help you understand what the agency decided. Right. Right, the agency – We're running out of time. Right. Okay? Okay. It will help if I'm able. Yeah, I'm having some echo. I apologize. Are you having trouble hearing yourself? Yeah, just a little echo, so I apologize. Oh, I'm sorry. Okay, I'll try to go. If you can't hear it, let me know and I'll try again. Sure. It's really unfair to you if you can't hear it. So my understanding from what you said and from the record is that the only tool for dealing with bycatch that all the alternatives did was the same tool. There were no alternatives for dealing with bycatch. They all just said we're just going to lower the overall catch. I'm not saying whether that's good or bad. I'm just saying there were no alternatives considered for dealing with bycatch. It was just lowering – there was no alternative that said, actually, we could lower the catch limit, but not so much, but also impose X, Y, or Z on the recreational effect. Right? It was all just lowered. All the alternatives also included, for example, reference in the rule to, for example, season closures if the incoming data would indicate that they're going to reach or exceed those annual catch limits. While it is true that these annual catch limits were set taking account of what would happen with respect to bycatch and that the recreational sector, it was well understood before and after that there would be potentially bycatch and even the statute comprehends that, for example, in Section 1801 of the EPA. So the question – the answer is just to make clear. Right. Instead of the alternatives analyzed, none of them did anything to deal with bycatch other than they were going to lower the annual catch limit. And, of course, that catch limit is being extended. None of them differed on that basis because the season closures and the incoming data, for example, is something that applied to all of them. But that is not an issue with it because they did not propose, for example, an alternative or say there should have been some other alternative in the mid-question. Sure. It's an obligation on the agency to diminish, decrease bycatch, especially bycatch mortality, to the extent practicable. So now we've got the basis. All we can do is lower the catch limit. And then if something goes wrong, we'll shut things down. Where did they say there was nothing more practicably that could be done? There's all this talking about things. Where did they say – they should have said that. That's the legal standard. I want to explain why to the extent practicable imports that. And the reason that it imports that – To the extent practical imports what? This analysis of taking account of, for example, competing objectives under the national standards, which is something that appellants conceded before the district court. And that other circuit likes the first. They should have said – and it's not a magic words thing. There's a sentence where they said this is all that can be done. I don't – practicably can be done. It's not all that can be done, of course. But all that practicably could be done as required by Standard 9. Did they make that judgment? My understanding is that to the extent practicable as understood by case law. For example, in the first circuit, there's a case called Lovgren. And Lovgren talks about how that takes into account the balancing that the agency must do with respect to other objectives. Because when you look at the structure of the act, and you see the various different national standards, you see that there are, in effect, tradeoffs between a number of different ones. For example, taking account of scientific data and the historic participation. But just balancing itself, just going, okay, here's a bunch of factors in the mix. Let's balance them. Isn't sufficient under Standard 9 unless they've said this is the best we can do as to bycatch, given these other competing considerations. I'm not sure they said we're doing the best we can to bycatch. They said we're not addressing it. Yeah, I think that understanding of the to the extent practicable, what it demands in this context, is at odds with the first circuit's understanding in Lovgren. I think it's at odds with the concession they found. You have to do conservation first. Whenever you're doing your balancing, you have to do conservation first, and then these other economic and social factors come in second. The agency did that here because all of the alternatives other than the, you know, first leave it as what Amendment 30B had or whatever their sense of the status quo would be, all of those alternatives were designed to have the same chance of preventing overfishing or having overfishing. And that's the standard. It's like it's baked in that we're not going to do anything other than lower the fishing limit, the catch limit. That's all we're going to do. That's baked into your options because there's nothing else there. When I look at this table, there's nothing else there. To be clear, I think that the understanding that they were required in this amendment, where it wasn't proffered as an alternative that there should be particularly considering. They don't have to comply with the statutory standard. If a party comes to the agency and tells them how to do it, you're the expert agency, but you don't have to do anything unless it's said to you. No, counsel, finish your statement, please. Yeah, I'd like to make two points on that. The first is that the statute itself, as I mentioned, and I believe it's 1801B3, talks about, for example, the recreational sector and trying to promote commercial and recreational fishing and even makes express reference to, for example, catch and release. So there is some sense in which the statute comprehends that there could be issues of – there could be bycatch, it could be part of what happens with recreational. Nevertheless, there are a number of provisions in the statute that talk about how conservation takes account, in a sense, to some degree, of impacts on the recreational sector. So, for example, there's reference to recreational benefits, and that's in the definition of conservation and management. In 18025, there's reference to it in the National Standard I, which a lot of cases have said, for example, in other circuits, that this is a bedrock principle and that this is something that gets balanced. Conservation, it means that our daily decisions included all those economic and social factors, so the daily decision said comes second after conservation. Even if it were true that the daily decision was only talking about preventing overfishing, as I mentioned – I'm asking you for the – it's your position. If I read daily, tell me if you read it differently, it says conservation first. That's what this is about. Government may like it or disagree or agree with it. I don't care. I'm bound by it. Conservation first, and then economic and social factors. I'm just going to lay it out, and then you can tell me. Yeah, I apologize. And I'm hearing what it sounds like if you're saying, well, what conservation means is all of these other economic and other factors first place. So daily was kind of silly when it said conservation was something that you would promote in its own right, apart from the economic and social factors. In fact, conservation means balance everything together. No, so what I'm saying is that when you look at NRDCV daily, there's a discussion, for example, of the central principle, and it talks about that principle of national standard one essentially as being the most central, which is this balancing of preventing overfishing while achieving optimum yield, which the statute expressly defines in a way that comprehends these sort of recreational opportunities. And as I mentioned, the statute comprehends that there may, in some instances, be bycatch. And the very fact that there's discussion of whether it should be minimized is taking account of the fact that there may be some of it, and it says to the extent practicable. What I'm saying is that the case law, consistent with daily and other circuits, talks about, consistent with the concession of the plaintiffs in the district court, that this to the extent practicable language brings in this sort of balancing to some degree with respect to the competing objectives of the other national standards. And that, of course, has to be the case to reconcile. Maybe this is what I'm not understanding. You already have conservation and all this balancing going on under standard four, right? That's how you get to optimum yield. That's a lot of balancing a whole bunch of factors, correct? Under the act at writ large, there are many. Even under optimum yield, the statutory definition, it's a lot of different factors in there, correct? Correct, in one, for example. And what does standard nine add? The Congress specifically added it later to deal expressly with bytatch. So what does standard nine require you to change from what you would have done previously under standard four in determining optimum yield? Right. It does suggest that there should be some analysis, for example, with respect to bytatch, and that there should be taking account of that as it does, as the agency does, consistent with all of the different national standards. It wants some action, right? I want to be clear, though. What I understand you to be saying is that the way the statute has been interpreted by the agency, it's not necessary to have an independent alternative focusing solely on conservation. But rather, it's sufficient if, in reviewing the other factors or standards, national standards, conservation is considered. And I thought your answer was, in effect, if we read the entire record, we will see that when the agency was considering what to do here as to each of these national standards and as to each of the alternatives, we will see that the agency said something about how one standard would promote conservation either better or worse than another. And what I thought Judge Millett was asking for was, not in these words, but where would we find that or where would we find a statement that says, we've considered all the other conservation alternatives and determined they are not practicable and maybe given us a reason or two as to why they're not practicable. And I haven't heard you give us that answer. And maybe it's not there because that's not the way the agency is looking at this case. But that is at least what counsel has presented in this court as part or really as his main argument on behalf of his clients. Right. So I wanted to say two things. The first is that the agencies absolutely did clearly take account of conservation, even in the narrow sense understood by the plaintiffs when it set all these alternatives to have an equal chance of preventing overfishing. And it took that into account. Now, it did so in a balanced way by taking account, for example, the intertwined nature of the catch limits and the just realistic facts in the world. Where can we find that the agency said that? Sure. So the agency talked about how it was taking into account optimum yield with respect to recreational opportunities. At page 5818 of the joint appendix, for example, there is discussion of that to the extent practicable language and the discretion. This is not necessarily specific to the agency's interpretation, but it's actually, as I mentioned, something that is consistent with the understanding of the first circuit and talking about how there are these tradeoffs between the national standards and the concession of the plaintiffs in the district court that it does bring in the to the extent practical language does bring in this taking account of the competing objectives. And, for example, the updating of the data updating to reflect the more accurate data here was, in fact, reflective of also national standards to talking about scientific information and how to take account of that. There was consideration of how this would impact the recreational sector and all those statutory provisions, as I mentioned, and some of those, as I mentioned, were referenced by the agency as well. So there's both case law and there is the agency's understanding as described here. But there's also the concession, as I mentioned, in the district court. Here, I would say at the end of the day, the understanding of NRDCV daily was satisfied by the agency's constructing those alternatives carefully to make sure that they would equally prevent overfishing, even under the understanding being proffered of the statute by appellants. So with respect to bycatch, I also want to point out that, as I mentioned, there was an entire assessment of bycatch in Appendix B. There's a whole bunch of other citations in which they talked about all the many ways in which bycatch is being addressed and minimized, including not just the reduction of limits and taking account of it. As I mentioned, that's at the end of Appendix B-19. Are there new things imposed here? So taking account of it in the limits was certainly, you know, how they constructed. I like that question. The things that they discussed there, catch limits and season limitations and stuff, those are all things that were already in place. And the high amount of discard and discard mortality that the record revealed, particularly when you saw the increase in the recreational sector, already reflected the effects of those efforts to diminish bycatch, correct? Those things were already in place, and yet we have the discovery, I guess it was going on long, but it's new information to the agency that there is, wow, our bycatch problem is much bigger than we thought. Mortality is much worse than we thought because recreational fishing is much bigger than we thought. And that was already with all those things that were discussed in place, correct? So the Defend Act from 2020, I think the idea is that many of the particular measures, they are now identifying for the first time, quite frankly, some of them, an oral argument on appeal. I'm not talking about the bariatric chamber thing, okay? What I'm talking about is the things that are discussed by the agency. You're talking of your appendix. I mean, they talk about the bycatch problem and wring their hands a lot. There's no doubt about that. Is there anything that they mention there that you say is part of the calculus here as controlling bycatch that was not already in operation at the time these large bycatch things were reported, as in this bycatch happens even with those things in place? Is that true? Equally under what they have pointed out as measures. No, that's not my question to you. My question to you is are the measures that the agency mentioned things that were already in place and yet the recreational bycatch and mortality are as high as they are? Yes or no? Some of them interact differently. So, for example, as I mentioned, the season closures were taking account of incoming data under the new survey, which is part of adapting to the new data and the new methodology of it. It's something that operates differently with respect to taking account of what this amendment does and how it's taking account of the methodology. Sorry, I'm not understanding the answer. Is there anything new in what they discussed? Yes. Things that could control mortality bypass that were not already in place. We'll put aside that little barrier. Thank you. Right, which actually applies either way. So those protections are there as well. That's a new thing. Does that statute postdate the agency decisions? It's 2020. I don't think so, but my point is actually that it applies to the recreational sector, so they get whatever concerns there are about it. But anyhow, so there's... Right, but I guess what I'm saying is that some of the things like season closures, based on incoming data under the new survey methodology, do actually interact differently based on this updating with respect to the data. It's taking account of the new type of data, the data that is more accurate. And taking account of it, they didn't change. Did they change the season? They calculated what the season might be, and one of the considerations that they made was that there could be actually some alternate problems from Alternative 2, for example, with respect to aligning the season with other seasons. So, for example, you could end up with bycatch issues that are created or worsened by needing to throw back because allocating less, as the commercial sector wants, allocating less overall ACL to the recreational sector means that they have to stop fishing potentially earlier. I know, but that's just a pre-existing problem. That's always been, you know, the pros and cons of these limitations that were all in place. And so the only limitations discussed are ones that have done nothing to address the problem that is now... It was going all along, but the agency didn't know about it, and now it knows about it, and it says, well, we still feel like we have to do the 40-60 thing. I think we must do that. And so where are we saying, but given that we now know there's so much more to bycatch than we thought before, are we doing anything different other than lowering the catch limit? I think that, as I mentioned, there are some things that are different in terms of taking account. There is some things that are different in terms of how these enclosures interact. And there's also prejudice requirement with respect to this here. So looking at the alternatives as they were before the agency, there's also prejudice requirement in terms of how the Magnuson-Stevens Act and the APA comprehend that this analysis at the judicial review stage should go. It should be looking for whether the analysis had something clearly unreasonable and that further analysis would be determinative. And with respect to how the National Standard 9 operates... Statutory criteria, just assuming that... It would be a different outcome? You have to show there'd be a different outcome? No, I think it's still that further analysis would be determinative as to the assessment, for example, of the alternatives. But the point here is that if they want to proffer an alternative, as Judge Rogers mentioned, there are other mechanisms for them to try to seek to change... No, no, no. We understand that. But I think... I just want to be clear in my own mind that with the new data, some of the old tools will work differently and work to promote conservation. I believe that's... That's your argument, counsel. That is part of our argument, yes. What we can find in the record, and you can give us some assistance in that regard by giving us some page numbers, given the record here. So as to that issue, here are some record citations and here are the case citations. Well, I might suggest that we have you submit something in writing so that, for instance, I don't write down the page numbers and transpose the numbers or something like that. So we all have the correct numbers and we have the case citations other than those that are already in your brief. There's also Gutierrez in the D.C. Circuit, which talks about taking account of incoming data, which is what I'm... You hear what I just suggested. Do you have any objection to that? I think that it may not be necessary here, but we would, of course, be happy to do whatever the court orders. I can list them here and they would be on the reporting if the court would like. Right, and if it's on the recording, then I have to go get the recording and transcribe it. That's all I'm getting. You've got this data probably on your computer. I have it before me, this particular page site. If you'd like them, but I don't... Read me your best language. Okay. Read me the best language, but I think Judge Rogers requested that there be a follow-up letter, if I'm understanding you correctly, Judge Rogers, with... I think counsel doesn't want to do that, Judge Millett, and I'm certainly not going to force her to do it. Okay. No, I'd be, of course, happy to do whatever the court would like me to do. I just have... Why don't you answer Judge Millett's question now? Sure, sure. So, in the Amendment 53, the citations, just so you have the numbers, are Joint Appendix 3323, Joint Appendix... Joint Appendix 11. Yep, I'll say it louder. Joint Appendix 3323, Joint Appendix 3523... Wait, can we do one at a time? I'll get there with you. Okay, so 3323, and the language there... What... If you would like to see the final rule, actually, I think it would probably be the best. That's Joint Appendix 5814. Oh, so we're not doing 3323, we're doing 5814? Yep, and I can come back to that. Hang on a second. It's in the rule as well. All right. Stand up. Sorry, I've got to get a new volume. Which volume is it? 5814. Tina, which volume is it? Which part of the federal rule? These are 9 or 16. Joint Appendix 5814, it's page 25573 in Volume 87 of the Federal Register. I have it right before me. It's the front page of it that you're referring to? Yes. Are we talking about the rule, or are you talking about... The rule release. 37 Federal Register. What page number? 25573, top of the right column on the Federal Register Notice, talks about the in-season closures, and then the amendment citations I will provide you to talk about that, taking into account, as I understand it, the incoming data, which would be from the new survey methodology. All right. So, this one just says, are you talking about recreational red grouper harbors managed with catch limits, in-season, which is what you used here with catch limits, in-season and post-season accountability measures, season and area closures, a minimum size limit, and a recreational bag limit. That's the language you wanted to look at? No, the last part... It's like a general description. The last part describing season closure here talks about how there are season closures when it's projected to reach the recreational annual catch limit. There were careful scientific projections made at this stage based on the updated survey data, and that's what was taken account of in terms of setting these alternatives, et cetera, to set the equal prevention of overfishing percentages, which satisfies Daley. Closures just enforce the catch limit. They're not independent.  Is that what you're saying? Well, they take account of the data about how close they're getting to the catch limit, which were set taking account... The measure you... All they do is enforce the catch limit. So, we're back to where we started, which is the catch limit is the only... And this might be right or wrong, but the catch limit is the only thing the agency has done to deal with bycatch. Well, when the agency... As this enforces the catch limit, it doesn't change anything. When the agency gets new incoming data showing they're reaching or exceeding the catch limit, it talks about, for example, future season reductions if there are overages in prior years, and it takes account of that... They will enforce the catch limit if it's... But that will also address to the extent that it also addresses that discards were taken into account, as I mentioned, in the catch limit, and so taking account of that new data will interact differently with the updating to take account of the new data and survey methodology. Putting that aside, as I mentioned... If we get new numbers, because there is an awful lot of bycatch mortality here, that maybe they'll hit the catch limit sooner than we thought, at which point we'll have to close it down. The only premise for the challenge here that's before the court today... Is what I said accurate? My understanding is that the assessment under the law here, the case law and the statutory language... It's my understanding of what the agency said here. I'm not looking for case notations. Is it accurate? That what you said here, this was your key language, is that... And you can submit more, but this is where you pointed me to start, is that they will... Of course, they've got new statistics, so they're going to get new information in about compliance, and hopefully their new methods will get better and better for getting accurate data. And if it shows the catch limit is being exceeded, we will respond to that. Correct? Or that if they're reaching it faster. Right. We will respond to that. So that's not a measure they've done now, that's simply catch limits are how we're dealing with bycatch. And if it turns out the catch limit is approaching, or we turn out it's been exceeded, we'll have to react. I agree with the... But I will point out again that the statute expressly comprehends that not every amendment is supposed to address in all ways bycatch, that their trade-offs are comprehended expressly in the statutory language and in other conditions by other courts, as well as daily in this court. We don't have that. To the extent practical. What I'm trying to explain is that the case law does not require that type of analysis. It requires taking account of the bycatch, trying to do things that take account of it and address it, and the agency did do that by making sure that its alternatives took account of what those effects would be. The statute expressly comprehends there may be bycatch. The agency expressly comprehended the trade-off, for example, of giving less to the recreational sector and how that could actually cause more throwback problems because the season would close earlier and people would be out there fishing for other fish and have to throw more back. It had extensive discussion of all the... If they shorten the season, it would cause more mortal bycatch than the longer season where people are... Everyone... You only get the accidental throwbacks, I assume, if you're out of season. That's going to be more than the bycatch problem that's caused by... For example, say your season closes normally in December. We've got whatever your statistic is on mortal bycatch going all the way to December, and we know these are pretty high numbers. You're saying if we have to stop the season in November, the number of people who accidentally catch red grouper and throw them back will be higher, more mortal bycatch than if we had to stop the season in December. That's what the agency found? It found that there is an offsetting effect. I'm not saying that they found that this would necessarily translate to more in the other direction, but what I am saying is that the agency did a careful trade-off that involved its scientific expertise... No, you said if we shorten the season, there'll still be discards. I thought you said there would be more of a problem. There'll still be a problem, but there'll be less of a problem because there's less throwback... There is another countervailing effect is what I'm saying, that it took account of when it was trying to assess in the process of trying to minimize bycatch to the extent practicable. And when it did the assessment of what was practicable, it took account appropriately as the appellants have competed as case law, for example, and other circuits establishes, it took account of the trade-offs of the other competing objectives, for example, under the national standards. And to reconcile those standards in the act, there needs to be an understanding that some of them have to give way to one another to some degree, so it can't be obviously that... I understand your argument they balanced all these other things. I've just been asking for where they address bycatch, and it sounds like we just keep ending up with... There was extensive addressing. There was extensive addressing. I think to the extent that they needed to develop a separate alternative, that's not what the case law requires. Did you want to ask about the... I had a question about the economic analysis. I read the briefs on both sides, and I read the economic analysis in Amendment 28 and in this Amendment 53, and I honestly don't see the difference. In Amendment 28, the service said it was not possible to rank the alternatives based on the expected net benefits to the nation, and they had, in that case, I think nine different alternatives. Here they have six. And the point that was made there was that the recreational sector's quota isn't efficiently allocated within the sector. There's so much variation of revealed preferences among recreational fishers that you just can't necessarily know the optimal marginal fish value. Anyway, the analysis in support of Amendment 28, which the service said did not allow the the analysis relied on in Amendment 53, and I would love your response to what I'm missing. Sure. So I would say two things to that. The first is that it wasn't a change in position in that formal sense in terms of what would be a bearing on this amendment that is under consideration now in this challenge, because it was talking about, first of all, the alternatives in that amendment, and it specifically said ranking of the alternatives in this amendment based on the expected net benefits. This is like the old joke. The facts of that case are different from the facts of this. Well, what I would say is that... Currently speaking, I drilled down, and I did not see it. Right. So as I understand it, this was a data-specific analysis, right, in terms of what data was available. And I understand your point as to what underlying principle was being discussed. To the extent that there was any inaccuracy, though, whatever this was, even if it were a change in position, it was fully explained. And so the discussion in the rule talks about how primarily what Amendment 28 was really talking about was this maximization versus comparison of specifically identified alternatives here. No, they were comparing a set of alternatives, and they were assessing them, and the service said we can't add the economic benefits of the commercial sector and the economic benefits of the recreational sector because those two things are incommensurable measurements for this reason. I'm not sure I agree with it, but, you know, that is not my job. Sure. So they do make a point in support of 28, and it's the effort to distinguish it, actually, that to me is problematic, because if you said, yeah, we did that there, we thought that was, like, you know, the whole thing is average and across the recreational sector. Who cares whether the particular marginal fissure has a lower or higher revealed preference? So we disagree with what we found to be inadequate in Amendment 23. We're going to rely on that in Amendment 53. That would be a different case, but that is not what the service did. And, honestly, I don't see the factual distinctions in any of the briefing holding water. Right. So as I understood it, what I guess I'm saying is two points. The first being, which you may or may not accept, the first being that I think that the statement that was being made there was not a broad statement of principle. It was a statement with respect to the data that was available for that particular amendment. Even if you thought there was inconsistency, there is some explanation, even if that explanation were determined to potentially be capable of being more, I will point this court to the standard that has been adopted to the First Circuit and the Fifth in Little Bay Lobster. I don't see the First Circuit case cited in your briefing list. So I don't believe it was cited there. It is, but it was the reference that was being made, the argument that's being made in terms of what was being asked about. I heard you mention the First Circuit case. Tell me, I don't see it cited in the briefing. So it is Little Bay Lobster. I can give you the citation if you'd like it. 352F3-462 at pages 469-470. Hold on. 352F3-462 at pages 469-470. Which is relied on in a Fifth Circuit case, Postal Conservation Association. 846F3-99. 846F3-99. At page 108. That talk about how the agency's analysis needs to be sustained unless it's clearly unreasonable as to a particular omission for which further analysis is likely to be determinative. I made reference to this before. The prejudice argument was made in the brief. That was the policy that was being had, for example, about the Alternative 3 through 5 and how a remand essentially wouldn't make much difference. These were very close, and there's not much reason to expect that things would be different. And I guess what I would say is that to the extent that there was concern about Amendment 28 and Amendment 53, all that's happening is that Amendment 53 made clear that it was taking the position that on this data, it believed that there was sufficient evidence to make a determination as to these particular alternatives, and that question, that determination is not undercut here. It's not clearly unreasonable. It's also the case that remanding wouldn't necessarily be determinative of any of the agency's decision or selection among the alternatives because, as mentioned, it's not clear that it would go any other way based on just whether Amendment 28 had some language that may or may not be consistent with the better understanding now with respect to 53. You said you had two reasons. One, in Amendment 28, it was not a broad statement of principle but data-specific, and your second argument was? There is explanation affirmatively in Amendment 53 that here there was a determination that there was sufficient data to make that comparison, the relative comparison. There's no difference in the nature of the data on the preferences within the recreational sector in the two different records that I can perceive. And if the assessment of the court were that there was some change in understanding, it undercuts primarily Amendment 28, not Amendment 53 where there was extensive discussion of why it was well-founded here. To the extent that it would be the court's error if they had made this error. Right, because with respect to the particular alternatives here, there's not any reason to think that between 3 through 5 that it was going to make much difference to the analysis. And I would also say that with respect to the alternatives that the commercial sectors offering, none of those would have actually done the things that the agency rightly was taking account of, which were not clearly unreasonable, such as updating for the actual historic participation. The 76-24 proportions or percentages that the commercial sector wants are based on an amendment that was based on data that they admit was not the truest state-of-the-world representative. Right, and so there's updated data now that shows that the foundation for those numbers, the alternatives they want, is really not there. If the service were to depart from relying on historical allocation and mirroring that and carrying it forward, in other fisheries, in other species, what are the other ways that these allocations are made or might be made here? You mean as opposed to taking account of historic? Methodologically. Right, so historic participation reflects some sense of relative interest in participating in the fishery by these different sectors, recreational including kids out fishing with their grandparents, and the benefits that are accrued to them that are not just about how many fish are caught, kept, killed, and sold, as in the case of what happens for the commercial sector. There's many other considerations described under the national standards that the agency did take account of in doing its analysis. And maybe you don't know this, but more broadly, is every fishery typically, is this the go-to method for kind of beginning allocation? It's like, let's look before this law was in place, what the sector's relative shares were. Is that, how prevalent is that? I'm not sure. I don't think it's in every case. However, what I would say is for purposes of this case, the commercial challenge here, it's saying this determination by the agency is unreasonable, which is of course the standard, is based on only alternatives among which they're all based on some sense of historical allocation. I know that. Except that the ones they're basing it on are based on outdated or less accurate data. Currently, I'm asking you because it seems like the gist of their position is once it was revealed to the service that in practice, historically, the recreational sector actually occupied a much bigger share of the fishery and grew on a much bigger share. It was incumbent on the service, and I think they're not saying this explicitly, but implicitly to abandon that. Right. I think that they were trying to make an affirmative value-based argument that the service should take into account. At that point, I would say that that would be them trying to substitute their judgment about what matters in a way that is at contention with some of the material in the statute that I was pointing out. For example, the statute does talk about recreational benefits, that it doesn't just adhere in the most fish- But not at all costs, and that's the difficulty. Not at all costs. Of course, with these trade-offs and taking account of- The other question I had is about permits. The Louisiana brief says recreational fishing is recreational fishing. Of course, it's not as regularized and regulated in the same way as commercial, but many states require recreational fishing permits. It seems like now with apps, I mean, there's so much one could do to track spot catch, for example. In an appropriate challenge or an appropriate petition or an appropriate avenue, many affirmative policy-based considerations would be taken into account. Here, there was an extensive analysis, taking into account the effects on the ground of what these different alternatives might be, taking into account what the impact would be of better reflecting the historic participation, deciding to, you know, taking account of the national standards, more evenly distribute reductions across the sectors based on their reflected interest in participating, and to the extent that there is some desire affirmatively to make change as a policy matter in this area, as, you know, the Dissent Act or some of these other statutes and other regulations show, there are avenues that may be pursued. And so if the commercial plaintiffs here are really concerned about those underlying things, then there are other ways in which they can do that. But this amendment did promote conservation, for example. It did reduce everyone's annual catch limits to take account of impacts on the stock in the stock assessment. And in reflecting historic participation, it was reflecting some of the benefits that the statute comprehended. You effectively made that argument. I just have a really simple descriptive question about the math. On JA 3427, the appendix says that 1.73 million pounds in corporate units is equal to .824 million pounds in the phone survey units. And then when they do the – that it's functionally the same allocation, which is translated as an out somewhat differently in the record. I'm not sure why. 75.4% versus 24.6% allocation, not 76 to 24. Why is – what are the different numbers there? Do you know what I'm talking about? I'm looking at 3427. Is that the one you said? And it's also 3342. There's just one set of pair of numbers is 75.4% versus 24.6%. And the other, which is Amendment 30B, is 76 to 24. Why are they – why is it not 76 to 24 in the recalculation for the alternative in this rulemaking? I'm looking at 3427. Is that what you're saying? And 3372, is that what you're saying too? If this is not familiar to you, well, I can skip it. No, it's 3342. 3342, I'm sorry. Yeah, 3342, 3427. Just the question is why one is – why – Amendment 30B talked about 76, 24. But the recreation of that in the current chart that you have pointed to has some decimals, and maybe it's just a rounding decision. You know, I'm not sure, Your Honor, because I don't know that I see the references. Well, we could always submit a letter to the agency. Sure. I don't know that I see those numbers at these pages. We've been here a long time. I'm going to let you wrap up. All right, thank you. Any other questions? All right, thank you very much, Counsel. Thank you so much. Mr. Hobbs, we'll give you three minutes. Thank you, Your Honor. Just to touch on a couple of brief points here. First of all, with respect to Amendment 30B, the assumption there was that the ratio of discards to landings were roughly the same between the commercial and recreational sectors. The citation for that is Joint Appendix 4558. That was the assumption for 30B when the 76, 24 allocation was set. That is what fundamentally changed when it came time for Amendment 53, and it was learned that the ratio of discards in the recreational sector was actually much higher. That's why it's our contention that when the agency learned that new information, it was required to do so. There's argument here and questions about, is your position that once they discovered the new information, 76, 24, and they discovered a bycatch problem, or discovered or just computed or figured out that with that change to 60, 40 is a big increase in bycatch, is it your position that the agency has to abandon reliance on historical allocations as part of its decision making and setting the new amendment here? It's a good question, and to answer your question earlier, that is typically what is done in allocations. At least that I've been involved with around the country, the starting place is typically what did everybody catch and ask? Are you asking for them to change that starting point? We don't think that necessarily needs to change, but that can be the starting bid, and then you have to look at, okay, if we make an allocation based on this, are we complying with the national standards? Now, on that phase nine, I just want to understand the scope of your proposed reading there. If the service amends the fishery management plan, no matter how focused the reason for it, the service has to consider every reasonable alternative measure that could potentially minimize bycatch? I don't think the service needs to do that every time. Okay, so if this rule is all about just queuing to the same historical data, the same historical period of years, taking the new survey data, what it tells them, and mapping it onto that, right? Just doing a translation from Fahrenheit to centigrade, why would that trigger a requirement to consider every potential measure to minimize bycatch and not be satisfied by what the service did here, which would say, ooh, there's more bycatch going on. It has been for years, then we realize, and so we have to lower the ceiling for that. Right, so the agency, I think what the statute says is that conservation and management measures shall minimize bycatch to the extent. I think the reason that matters here is because the agency learned something new about bycatch that it didn't know before. And so that should have triggered an obligation in the agency to do something about those higher levels of bycatch. In other words, if the agency had just updated the allocation formula with the new landings numbers, not taking into account the bycatch, as was done, then the agency is failing to consider an important aspect of the problem. So let me ask you, counsel, were these objections raised to the agency, and by that I mean that it was impermissible for the agency to take the approach it has taken, namely by saying the tools that we've employed in the past to promote conservation, we expect now that there will be different responses, and we'll look at them, look at those responses, you know, and act accordingly then. But for now, we're doing this translation to FEC measurements, and we know a lot more, but in our agency opinion, we're not persuaded, given the tradeoffs between these different standards and different interests involved, that we're in a position to do more until we get further information about how things that we have in place function with this new data set. And based on what was presented to us, while the agency has the burden to support its action, nevertheless, it responded to what was presented, and has explained why it decided to do what it did now. Long question, sorry, but you get the thrust. Yes, I get the thrust, Your Honor, and our response is that when the agency decided to act here, to enact Amendment 53, make the allocation change on paper, that triggered an obligation to ensure compliance with all of the national standards. What I'm getting at, counsel, is the agency says, look, we may not, these are my words, not counsel's words, we may not have an alternative that says, this is all about conservation. But rather, we have these alternatives where they have different effects on conservation. And given the other concerns we have, in addition to the interaction of the standards, why isn't this a reasonable way to proceed now? Given that it has this new information, it's not going to ignore the new information, but it wants to see how sort of the system works. And while it takes this sort of broad brush approach of just lowering the catch, why isn't that enough for now? That's what I'm not clear on. Not that you may not be entitled to consideration of these other options, including what Congress has put on the table. But I'm not clear exactly why, what the agency did in explaining what it was doing now, and not ignoring Standard 9. Even though, from the court's perspective, it would have been a lot easier had they included a sentence that says, we've decided that anything else at this time is impracticable. Yes, Your Honor. So, I've looked for such a statement in the record. I've not been able to find one. Nor is there any commitment from the agency to actually take action to minimize bycatch in a recreational fishery in the future. Well, we can't assume that the agency is going to act unlawfully intentionally, if you understand what I'm getting at. There's a presumption here. Of course, Your Honor. But I would also submit that... And please tell me where it is. We are making a decision to wait and see and get more information about the bycatch problem. Because we've got new statistics. And so, for now, we're just doing the annual catch limits. But as to further bycatch measures, we want to wait and see how these new numbers work. Did they say that? I have not found any statement like that, Your Honor. Did they say, we want to do a wait and see and deal with this incrementally? No. My understanding is that they essentially threw up their hands and said, we've done as much as we can do, but they've never made that finding. What do you mean, counsel? The agency said, it's done as much as we can do. Isn't that tantamount? I'm sorry, Your Honor. They never made that finding. But if you read the bycatch practicability analysis, it goes through all of the prior measures that were in place. Nothing new was done in this amendment to address bycatch, notwithstanding the new information. I know, but that's like, now you have this new data, and you can see how these tools work. And they don't know that yet. So they say, okay, so we just reduce across the board for now. They didn't say that. They already knew these tools didn't work. That's what caused the bycatch problem. They already knew these tools are the ones that left them with the current bycatch problem. Correct, Your Honor. And importantly, also, reducing the catch limit did absolutely nothing to minimize bycatch. That accounted for the mortality. That's an overstatement, counsel. You don't have to make it to make your point. But I just think your argument has to be, presumably, if you presented this to the agency, as you're presenting it to the court, that the agency couldn't do anything except consider an alternative based on Alternative 9, on National Standard 9. I think as we've talked about, Your Honor, there are a number of things the agency could do. I would even point the court to the agency's own statements in the Oceana case about what Section 1853A15 requires, and that's to accurately assess bycatch during the fishing season. In other words, from your client's point of view, it would have been better for the agency not to have done anything. All right? And let the system go forward. And then in the future, and not necessarily too distant future, consider this new data and the translation. And just delay the translation further, rather than get it done with, get the new data, chew it over once you see how it works, now that you have the data, that that's just impermissible. And you may be right, but I just want to understand if that's your argument and that's how you presented it to the agency. Yes, I think that's a fair assessment, Your Honor. I think what we were saying is that we acknowledge that there's this new survey data. That provides a rational basis for regulatory action. But then the result of that, the action that was actually taken, is arbitrary and capricious because it failed to take, to address an important aspect of the problem, and that is the new information that was provided. What they need to wait and see for, since all this was, were numbers that reflected what was already happening out there, including the bycatch problem. So we already know, the agency already knows what the bycatch problem is with these new numbers. It's like they said, this isn't something they've invented. This is what's been going on all along. So it's been going on all along. It's a 60-40 split. And also what's been going on all along with that 60-40 split is a much, much more significant bycatch problem and mortality bycatch problem than we realize. There's nothing new to wait and see what happens. They already know what happens with these numbers. Precisely, Your Honor. I'm not sure what waiting longer and having further years more bycatch would have told the agency that it didn't know. That's right. Any other questions? All right. Thank you very much. Thank you, Your Honor. The case is submitted.
judges: Millett, Pillard, Rogers